IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

LARRY ASKINS, et al.,

                  Plaintiff,         Case No. 3:14 cv 1699

    -vs-

OHIO DEPARTMENT OF
AGRICULTURE, et al.,

                  MEMORANDUM OPINION
                  AND ORDER

                  Defendant.

KATZ, J.

      Plaintiffs Larry and Vickie Askins filed a complaint against the United States Environmental Protection Agency, the Ohio Department of Agriculture, and the Ohio Environmental Protection Agency pursuant to the Clean Water Act, 33 U.S.C. § 1365(a)(1) and (2). (Doc. No. 1). Plaintiffs subsequently amended their complaint. (Doc. No. 14). Plaintiffs have moved for a preliminary injunction (Doc. No. 2), which the Defendants oppose. (Doc. Nos. 16, 18). Plaintiffs have not filed a reply.

      Plaintiffs move the Court, pursuant to Federal Rule of Civil Procedure 65(a), for a preliminary injunction enjoining the Ohio Department of Agriculture from issuing "Permits to Install (PTIs), Wastewater Management Plans aka Permits to Operate (PTOs), or National Pollutant Discharge Elimination System (NPDES) Permits for Concentrated Animal Feeding Operations (CAFOs) without authorization by Defendant U.S. Environmental Protection Agency (U.S. EPA) by an approved Memorandum of Agreement (MOA) pursuant to 40 C.F.R. § 123.24." (Doc. No. 2, p. 1; *see also* Doc. No. 14, p. 7).

      A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council,*

*Inc.*, 555 U.S. 7, 22 (2008). A request for a preliminary injunction is evaluated under the following "four-factor test:"

> (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction. These four considerations are "factors to be balanced and not prerequisites that must be satisfied."

*National Viatical, Inc. v. Universal Settlements Int'l, Inc.*, 716 F.3d 952, 956 (6th Cir. 2013) (citations omitted); *see also Winter*, 555 U.S. at 20.

In 1972, Congress established the Clean Water Act in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this objective, the statute prohibits the discharge of any pollutant or combination of pollutants to navigable waters unless the discharge is authorized by a permit issued under the national pollutant discharge elimination system program. 33 U.S.C. §§ 1311(a), 1342(a). A part of the regulatory focus of this program is to control wastewater discharges from manufacturing and industrial facilities, and sewage treatment plants.

The United States EPA has the authority to administer the discharge elimination program. 33 U.S.C. § 1342(a). However, the statute does allow states to submit a permit program to regulate discharges subject to approval by the EPA. 33 U.S.C. § 1342(b). The EPA must approve a state's discharge program unless the Administrator of the EPA determines that adequate authority does not exist to impliment the program in compliance with the Clean Water Act. *Id.* If a state demonstrates that adequate authority exists and the EPA grants approval, then the authorized state agency will issue the discharge permits while the EPA retains statutory oversight of the state's administration of that program. 40 C.F.R. § 123.24.

In 1973, Ohio's EPA sent a request to the United States EPA to administer a state discharge permit program. On March 11, 1974, the two agencies entered into a Memorandum of Agreement to delegate the discharge permit program to Ohio's EPA. Since this time, Ohio's EPA has issued discharge permits for all source discharges in Ohio, including those for concentrated animal feeding operations.

In 1974 and 1976, the EPA issued its first concentrated animal feeding operations regulations. *Waterkeeper Alliance, Inc. v. U.S. E.P.A.,* 399 F.3d 486, 494 (2d Cir. 2005). The regulations defined the types of livestock operations that qualified as concentrated animal feeding operations, and established discharge permit requirements and guidelines for such operations. *Id.* The regulations remained applicable until the 2003 Concentrated Animal Feeding Operations Rule was adopted. *National Pork Producers Council v. U.S. E.P.A.,* 635 F.3d 738, 743 (5th Cir. 2011). In 2005, the Second Circuit vacated portions of the 2003 Rule that required all concentrated animal feeding operations to apply for discharge permits whether or not the operations had discharges. *Id.* at 744–45. In response to that decision, the EPA issued the 2008 Concentrated Animal Feeding Operations Rule which required such operations to apply for a discharge permit if the operations discharged or proposed to discharge pollutants. *Id.* at 746. The Fifth Circuit subsequently vacated portions of the 2008 Rule. *Id.* at 749, 756. On July 30, 2012, the EPA removed the proposed to discharge requirement. 40 C.F.R. § 122.23(d) (2014).

Prior to 2002, Ohio's EPA issued permits to install, along with livestock waste management plans, to regulate the design, construction, and operation of feeding operations with 1000 or more animal units. The install permits and the waste management plans were issued to regulate wastewater treatment systems, along with the application of manure and agricultural

3

wastes on land. These programs were state-created and were issued and enforced only by Ohio's EPA under Ohio Rev. Code Chapter 6111. These programs were not administered under the Clean Water Act, and were not a part of the national pollutant discharge elimination program implemented by Ohio's EPA.

Ohio's EPA issued its first discharge permit to regulate production area and land application discharges from concentrated animal feeding operations in 2002. Unlike the state's programs, the national pollutant discharge elimination system permits were administered under the Clean Water Act and were subject to federal oversight. The evidence shows that since 2002, Ohio's EPA has issued approximately fifty-two national pollutant discharge elimination system permits to concentrated animal feeding operations. There are thirty-seven concentrated animal feeding operations facilities in Ohio with active national pollutant discharge elimination system permits enforced by Ohio's EPA.

Prior to 2002, Ohio's Department of Agriculture had no role in regulating environmental related issues associated with large animal feeding operations. In 2000, Ohio enacted a new law, codified in Ohio Rev. Code Chapter 903. The statute created the Ohio Department of Agriculture's permit to install program, along with the program for concentrated animal feeding operations. The law authorized the adoption of administrative rules and the creation of the Division of Livestock Environmental Permitting within the Ohio Department of Agriculture to administer the state program. Since 2002, the Ohio Department of Agriculture has implemented and enforced the state permits to install and feeding operations programs pursuant to state law. *See* Ohio Rev. Code Chapter 903.

The law transferred authority from Ohio's EPA to Ohio's Department of Agriculture to administer only the state permit to install program and required the Director of Ohio's Department of Agriculture to create a state permit to operate program. Ohio law prohibits the construction and modification of new or existing large animal feeding facilities without a permit to install issued by the Ohio Department of Agriculture. *See* Ohio Rev. Code § 903.02. The permit to install regulates the design, construction, and modification of manure storage or treatment facilities at concentrated feeding facilities to ensure manure and agricultural wastes are properly collected and stored to prevent discharges. Ohio Rev. Code § 903.03 prohibits the ownership or operation of a concentrated feeding facility without obtaining a permit to operate. A permit to operate consists of a manure management plan, insect and rodent control plan, mortality management plan, emergency response plan, and an operating record. The permit to operate includes best management practices for the proper management of storage facilities and the land application of manure to prevent or minimize water pollution.

The permits to install and to operate were created under Ohio law, and are issued to concentrated feeding facilities that are designed to collect, store, and apply manure and agricultural wastes for crop production, rather than discharge manure and agricultural wastes into the waters of the state. Furthermore, these permits are not components of Ohio's EPA's national pollutant discharge elimination system permit program or subject to the requirements of the Clean Water Act. There is no federal equivalent of these state permits in the Clean Water Act. *See* 33 U.S.C. § 1342. Further, the Ohio Department of Agriculture has independent jurisdiction to administer the state permit program for concentrated feeding facilities.

Finally, Ohio Rev. Code § 903.08 authorizes the Director of the Ohio Department of Agriculture to seek delegation to participate in the national pollutant discharge elimination system program in accordance with the Clean Water Act. The Director must submit a national pollutant discharge elimination system permit program to the EPA for approval. Ohio Rev. Code § 903.08. Once the EPA approves the program, the authority to issue and enforce the national pollutant discharge elimination system permits to concentrated animal feeding operations for the discharge of pollutants will transfer from Ohio's EPA to the Ohio Department of Agriculture.

The requirements which states must meet to obtain approval from the EPA to administer and implement a national pollutant discharge elimination system program are contained in 40 C.F.R. Part 123. The various requirements to obtain approval are set forth in 40 C.F.R. §§ 123.21–.24.

The Ohio Department of Agriculture has obtained statutory and regulatory revisions for the proposed transfer of the national pollutant discharge elimination system permit program. In 2006, Ohio submitted its state program to the EPA for approval. The EPA reviewed the request and raised concerns regarding the proposed transfer of the program from the Ohio EPA to the Ohio Department of Agriculture. In response, Ohio's EPA and the Ohio Department of Agriculture proposed additional statutory and regulatory changes. In 2008, the EPA issued a proposed approval of Ohio's transfer request contingent upon the adoption of certain changes in Ohio law.

From 2008 to 2013, the Ohio Department of Agriculture proposed more revisions to various Ohio laws to address the EPA's concerns and to ensure compliance with the federal discharge regulations for concentrated animal feeding operations. However, the Ohio Department of Agriculture has not yet submitted an updated program to the EPA for review and approval.

Therefore, Ohio's EPA continues to issue the national pollutant discharge elimination system permits to concentrated animal feeding operations as no transfer of that authority to the Ohio Department of Agriculture as been approved by the EPA.

After carefully evaluating and balancing the four factors required to obtain a preliminary injunction, *National Viatical, Inc.*, 716 F.3d at 956, the Court concludes that the Plaintiffs are not entitled to such relief and their request for a preliminary injunction must be denied. The Court finds that the Plaintiffs have not shown a likelihood of success on the merits. The evidence before the Court establishes that the Ohio Department of Agriculture does not issue the national pollutant discharge elimination system permits to concentrated animal feeding operations. That responsibility still lies with Ohio's EPA. Further, the transfer of this responsibility from Ohio's EPA to Ohio's Department of Agriculture has not been approved by the EPA. Therefore, Plaintiffs' request for a preliminary injunction would be for naught as the Ohio Department of Agriculture does not currently issue the national pollutant discharge elimination system permits. Because the department does not engage in any unauthorized activity regarding the permits, Plaintiffs have not established a likelihood of success on the merits. *National Viatical, Inc.*, 716 F.3d at 956.

Plaintiffs would not suffer an irreparable injury absent the preliminary injunction. *Id*. As previously noted, the Plaintiffs seek to enjoin an action which does not exist. The Ohio Department of Agriculture does not issue the permits in question. Rather, that responsibility still lies with Ohio's EPA. Thus, the alleged injury the injunction seeks to prevent does not exist.

The Court further finds that the grant of the injunction would not be in the public interest as it seeks to prevent the Ohio Department of Agriculture from engaging in actions which it does

not perform. No public interest is served in issuing an injunction to prevent events which do not occur.

## Conclusion

Accordingly, Plaintiffs' motion for a preliminary injunction (Doc. No. 2) is denied.

IT IS SO ORDERED.

                                                                     s/ *David A. Katz*
                                                                 DAVID A. KATZ
                                                                 U. S. DISTRICT JUDGE